UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

GENERAL MILLS, INC.,

                Plaintiff,

       -v-                               3:16-CV-58

CHOBANI, LLC, a Delaware limited liability
company,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                        OF COUNSEL:

BLACKWELL, BURKE LAW FIRM       JERRY W. BLACKWELL, ESQ.
Attorneys for Plaintiff
431 South Seventh Street, Suite 2500
Minneapolis, MN 55415

PERKINS, COIE LAW FIRM           CHARLES C. SIPOS, ESQ.
Attorneys for Plaintiff
1201 Third Avenue, 48th Floor
Seattle, WA 98101

BOND, SCHOENECK LAW FIRM      DAVID L. NOCILLY, ESQ.
Attorneys for Plaintiff                   JONATHAN B. FELLOWS, ESQ.
One Lincoln Center
Syracuse, NY 13202

FOLEY, HOAG LAW FIRM             JULIA HUSTON, ESQ.
Attorneys for Defendant           DAVID A. KLUFT, ESQ.
155 Seaport Boulevard             ANTHONY E. RUFO, ESQ.
Boston, MA 02210

HARRIS, BEACH LAW FIRM         DOUGLAS A. FOSS, ESQ.
Attorneys for Defendant           SVETLANA K. IVY, ESQ.
99 Garnsey Road
Pittsford, NY 13534

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

This is a dispute between plaintiff General Mills, Inc. ("General Mills") and defendant Chobani, LLC ("Chobani), direct competitors in the yogurt market, over what constitutes fair play in advertising. General Mills initially filed this action in the United States District Court for the District of Minnesota, asserting claims for false advertising pursuant to the Lanham Act, 15 U.S.C. § 1051 *et seq*., and related Minnesota state law against Chobani's recently launched online, print, and television advertising campaign (the "Simply 100 Campaign"), which touts the fact that Chobani's new "Simply 100 Greek Yogurt" contains no artificial sweeteners or preservatives while making certain comparisons to Yoplait Greek 100, one of General Mills's yogurt offerings.

On January 12, 2016, General Mills requested a temporary restraining order and the entry of a preliminary injunction against Chobani that would bring a halt to certain claims made in the Simply 100 Campaign pending a resolution of the merits of their dispute. Chobani responded by requesting the case be transferred to the United States District Court for the Northern District of New York, since a similar dispute over claims made in the Simply 100 Campaign about products sold by The Dannon Company, Inc., a non-party here, had been filed. Chobani also sought to stay further proceedings in this action, including the briefing on General Mills's motion, pending resolution of its venue transfer request.

On January 14, 2016, an order issued granting Chobani's request and the action was transferred to this District. Shortly thereafter, General Mills's request for a temporary restraining order was denied. However, the parties were directed to expedite the briefing on

General Mills's still-pending request for a preliminary injunction, which Chobani timely opposed.  Oral argument was heard on January 22, 2016 in Utica, New York.  Decision was reserved.

## II.  BACKGROUND

The relevant facts have been drawn from the parties' submissions and are largely undisputed.  To the extent factual disputes exist, their resolution is unnecessary to the disposition of General Mills's motion.[1]

### A.  General Mills

General Mills, an internationally known company, lays claim to some of the most recognizable brands in the food industry.  Compl. ¶ 15.  And since acquiring exclusive licensing rights in the 1970s, General Mills has counted the Yoplait brand among them.[2]  Kurtz Decl. ¶ 4.  These days, Yoplait is one of General Mills's most well-known and important brands, and Yoplait-branded products "are the United States'[s] leading and most-recognized yogurts."  Id. ¶¶ 3,6.

But this recognition has come at a price.  "For example, in the last five years alone, General Mills has spent in excess of $900 million in the marketing and advertising of Yoplait products," including television, radio, newspaper, print magazine, and dedicated social media advertising.  Kurtz Decl. ¶ 5.

---

[1]  Following oral argument, the parties' submissions were reviewed and it has been determined that an evidentiary hearing remains unnecessary.  See Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations, 107 F.3d 979, 984 (2d Cir. 1997) ("Generally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when essential facts are not in dispute.").

[2]  General Mills acquired a controlling interest in Yoplait SAS, the brand's principal operating company, in 2011.  Kurtz Decl. ¶ 4.

In return, the Yoplait brand has brought its parent enormous success, ushering in revenues to the tune of one billion dollars annually.  Kurtz Decl. ¶ 4.  A substantial amount of this revenue is derived from sales of Yoplait Greek 100, a Greek yogurt that contains higher levels of protein than traditional yogurt.  Id. ¶ 7.  Packed into single serving, 100-calorie cups and offered in twenty flavor varieties, Yoplait Greek 100 caters to the health-conscious consumer and is marketed as a healthy, nutritious food choice.  Id. ¶¶ 7, 11.

### B.  Chobani

Chobani, a relative newcomer to the yogurt market, offers nutritious, delicious, and accessible food made with only natural, non-GMO ingredients.  McGuinness Decl. ¶ 2.  Since opening its first factory in South Edmeston, New York, in 2005, Chobani has quickly become, in its own words, the "No. 1 Greek Yogurt brand in the United States."  Id. ¶¶ 2-4.

Chobani actively seeks to differentiate itself from its competitors in the market by emphasizing its commitment to "natural, non-GMO ingredients" and "environmental sustainability practices."  McGuinness Decl. ¶¶ 2, 6-7.  In its brief history, Chobani's advertising efforts have pointedly communicated this message.

For example, 2013 saw the launch of Chobani's "Go Real Chobani" campaign, which sought to "empower consumers to choose to live their lives in the same 'real' and 'authentic' way that Chobani makes yogurt."  McGuinness Decl. ¶ 7.

Likewise, in 2014, Chobani launched its "How Matters" campaign, seeking to communicate to consumers that "the way Chobani makes its yogurt is just as important as the final product."  McGuinness Decl. ¶ 7.

More recently, in 2015, Chobani initiated its "To Love This Life Is [T]o Live It Naturally" campaign, "which celebrates the role that Chobani's products, made with only natural

ingredients, play in fans' lives, and encourages fans to seek food made with the simplest ingredients possible."  McGuinness Decl. ¶ 7.

## C.  The "Simply 100" Advertising Campaign

The advertising campaign at issue in this case purports to be an extension of Chobani's earlier, pro-natural-ingredients advertising efforts.  McGuiness Decl. ¶ 8.  In particular, Chobani planned a multi-media blitz in connection with its latest offering, "Chobani Simply 100 Greek Yogurt," which has "100 calories per serving with no preservatives or artificial sweeteners."  Id.  Again, Chobani sought to "highlight its products' natural ingredients" and therefore "resolved to talk about the natural ingredients in Chobani Simply 100 Greek Yogurt, as well as the artificial preservatives and artificial sweeteners contained in some of its competitors' products, and to share its opinion on the subject."  Id.  The campaign, which consists of a video advertisement (the "Commercial"), a print advertisement (the "Print Ad"), and digital/social media content (the "Digital Content"), began running in early January 2016.  Kurtz Decl. ¶ 17.

## 1.  The Commercial[3]

The Commercial opens with a woman seated behind the wheel of a vintage convertible, examining a cup of peach Yoplait Greek 100 yogurt.  Kurtz Decl. ¶ 19.  As she scrutinizes the product's ingredients label, the voice of a disembodied narrator intones:  "Yoplait Greek 100 actually uses preservatives like potassium sorbate.  Potassium sorbate? Really? That stuff is used to kill bugs!"  Id. ¶ 20.

---

[3]  A copy of the Commercial is attached as Exhibit B to the Kurtz Declaration.  The Commercial was also viewed at oral argument.

The camera briefly pans to a wide shot of her convertible parked along the dusty roadside before returning its focus to the woman, who scrunches her face in disgust before tossing the cup of Yoplait into a rickety wooden crate.  Kurtz Decl. ¶ 21.

Instead, the young woman raises a cup of peach Chobani Simply 100 Greek Yogurt into the frame as the details of a roadside stand packed with fresh racks of produce become visible in the background.  Kurtz Decl. ¶ 22.  The voiceover returns to declare:  "Now, there's Chobani Simply 100.  It's the only 100 calorie light Greek yogurt with zero preservatives."  See id.

The woman, now relaxed and happy, kicks her feet up as she tears open the packaging.  Kurtz Decl. ¶ 22.  As she takes a generous bite of the product, the camera pans once more to the fruit stand to reveal a happy child returning to the vehicle with a bag of produce in hand.  Kurtz Decl., Ex. B.  The camera finishes with a wide shot of the entire roadside setting, scenic mountains in the distance, as a cheerful jingle is heard in the background in which the singer croons, "to love this life is to live it naturally."  Text laid over this final shot includes a hashtag:  "#NOBADSTUFF."  Id.

## 2.  <u>The Print Ad</u>[4]

The Print Ad's header prominently displays a question:  "Did You Know Not All Yogurts Are Equally Good For You?"  Kurtz Decl. ¶ 27.  The Print Ad continues, "[y]ou think you are doing something good for yourself and your family [b]y buying yogurt and instead of bad stuff [a]nd then you find that the bad stuff* [i]s in your yogurt!"  Id.  The asterisk references a footnote printed at the very bottom of the full-page advertisement that explains, in a

---

[4]  The Print Ad is attached as Exhibit C to the Kurtz Declaration.

minuscule font size, that the "bad stuff" to which the Print Ad refers is "Artificial Ingredients." Id. The center of the Print Ad prominently depicts the ingredients label of a cup of Yoplait Greek 100. Id. The text above and below the Yoplait product mimics that of the Commercial's voiceover: "Look, there's potassium sorbate as a preservative in Yoplait Greek 100. Potassium sorbate? Really? That stuff is used to kill bugs." Id. The Print Ad goes on to state, "If you want to do healthy things, know what's in your cup. Chobani Simply 100 is the *only* 100-[c]alorie Greek Yogurt without a trace of any artificial sweeteners or artificial preservatives." Kurtz Decl. Ex. C (emphasis in original).

### 3. Digital Content[5]

The Digital Content consists of a website and corresponding social media efforts, including Facebook, Twitter, Pinterest, Google+, and Instagram. Kurtz Decl. ¶¶ 33-35. Text on the website also poses a simple question, asking "Do You Know What's In Your Cup? . . . . Scroll over to compare our ingredients with those in other light yogurts to see what's really inside[.]" Kurtz Decl. Ex. C. The Digital Content includes an image of Yoplait Greek 100 that, when selected, displays the product's nutrition label and list several items identified as "artificial" in large, red font. Id. Beneath the Yoplait image, a portion of the Digital Content describes potassium sorbate as both "an allowable chemical preservative for foods" as well as an "allowable minimum risk pesticide product[ ]." Id. This portion of the campaign also contains links to the Print Ad and Commercial discussed above. Id.

---

[5] Still images of the Digital Content are attached as Exhibit D to the Kurtz Declaration.

### D. **Potassium Sorbate**

Potassium sorbate, the preservative at the center of this dispute, is a "potassium salt of sorbic acid" that has been "generally recognized as safe" for human consumption by the U.S. Food and Drug Administration ("FDA"). Murray Decl. ¶¶ 8-10. According to the U.S. Department of Agriculture, "few substances have had the kind of extensive, rigorous, long-term testing that sorbic acid and its salts [like potassium sorbate] have had. It has been found it be non-toxic even when taken in large quantities, and breaks down in the body into water and carbon dioxide." Id. ¶ 11.

Commercial potassium sorbate is synthetically produced by neutralizing sorbic acid with potassium hydroxide. Id. ¶ 8. This process creates a "nature identical" chemical, meaning it is chemically equivalent to the molecule as it is found in nature. Id. It is regularly used in food products as a preservative, where it works to inhibit the growth of mold and yeast. See id. ¶ 12. Potassium sorbate is safe for human consumption and, when ingested, breaks down in the body into water and carbon dioxide. Id. ¶ 9.

"Because of its efficacy as a preservative, [p]otassium [s]orbate has been used as a preservative widely and safely for decades in cheese, dips, wine, dried fruit, and many other food products." Hood Decl. ¶ 6. However, potassium sorbate is also found in various pesticide products that are classified by the U.S. Environmental Protection Agency ("EPA") as "Minimum Risk Pesticide Products," a classification that exempts those products from certain regulatory requirements. Post Decl. ¶ 7. In those formulations, potassium sorbate is an ingredient in pesticides used to kill and mitigate insects. Id. ¶ 11.

## III.  LEGAL STANDARDS

### A.  Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (citing Munaf v. Green, 553 U.S. 674, 689-90 (2008)).  "The party seeking the injunction carries the burden of persuasion to demonstrate, 'by a clear showing,' that the necessary elements are satisfied."  Reckitt Benckiser Inc. v. Motomco Ltd., 760 F. Supp. 2d 446, 452 (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)).

However, "[t]o say that there is confusion in this Circuit regarding the appropriate standard for assessing an application for a preliminary injunction would be an understatement."  Golden Krust Patties, Inc. v. Bullock, 957 F. Supp. 2d 186, 194 (E.D.N.Y. 2013).  For over fifty years, it was well-settled that a party seeking such relief was required to satisfy a two-pronged test:  (1) a showing of irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting relief.  See, e.g., Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010).

The confusion stems from the Supreme Court's 2008 decision in Winter, where the Court framed the preliminary injunction standard as a four-pronged test:  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter, 555 U.S. at 20.

Two years later, the Second Circuit seemed to apply Winter's teaching to create a

slightly reformulated version of its traditional test while evaluating a copyright case:

> **First**, as in most other kinds of cases in our Circuit, a court may issue a preliminary injunction in a copyright case only if the plaintiff has demonstrated either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff]'s favor. **Second**, the court may issue the injunction only if the plaintiff has demonstrated that he is likely to suffer irreparable injury in the absence of an injunction . . . . **Third**, a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor. [**Fourth**], the court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction.

Salinger v. Colting, 607 F.3d 68, 79-80 (2d Cir. 2010) (emphases added) (internal citations

and quotations omitted).  And although this reformulated standard was limited to the

copyright context, the Salinger Court noted it could see no reason why it "would not apply

with equal force to an injunction in *any* type of case."  Id. at 77 n.7 (emphasis in original).

Following Salinger, our Circuit took a seemingly inconsistent approach to determining

when a preliminary injunction should issue.  See Bullock, 957 F. Supp. 2d at

193-94 (discussing various formulations of the standard in published and unpublished

post-Salinger dispositions); see also Christian Louboutin S.A. v. Yves Saint Laurent Am.

Holdings, Inc., 696 F.3d 206, 215 (2d Cir. 2012) (reverting to traditional two-pronged test).

However, "[d]espite the seeming inconsistency of the standards for a preliminary

injunction set forth by the Supreme Court and the Second Circuit, the Second Circuit has

subsequently reaffirmed that its standard remains good law." Marblegate Asset Mgmt. v.

Educ. Mgmt. Corp., 75 F. Supp. 3d 592, 604 (S.D.N.Y. 2014) (citing Citigroup Global Mkts.,

Inc., 598 F.3d at 38).

Therefore, "[i]n addition to the two factors embraced by the Second Circuit's traditional analysis (concerning the strength of the plaintiff's claims and the irreparable harm suffered by the plaintiff absent injunctive relief), the post-Winter standard requires the Court to consider the public interest and to 'balance the competing claims of injury[.]'" Bullock, 957 F. Supp. 2d at 194 (quoting Salinger, 607 F.3d at 79).

Accordingly, a party must establish four elements to prevail on a motion for a preliminary injunction: (1) a likelihood of irreparable harm; (2) either a likelihood of success on the merits or sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in their favor; (3) that the balance of hardships tips in their favor regardless of the likelihood of success; and (4) that an injunction is in the public interest. Marblegate Asset Mgmt., 75 F. Supp. 3d at 604; see also Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 895 (2d Cir. 2015) (incorporating additional factors); Am. Civil Liberties Union v. Clapper, 785 F.3d 787, 825 (2d Cir. 2015) (same).

**B. Lanham Act**

Section 43(a) of the Lanham Act provides a cause of action for unfair competition through false advertising. 15 U.S.C. § 1125(a). As relevant here, the Act's language imposes liability on anyone who, "in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the

nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." § 1125(a)(1)(B).[6]

In other words, a so-called "false advertising" claim is a bit of a misnomer, since "[f]alsity [within the meaning of the Act] may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers." Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 255 (2d Cir. 2014) (quoting S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001). Accordingly, "[t]he Lanham Act's false advertising provision allows a plaintiff to base its claim not only on statements that are literally false, but also on statements that are misleading when considered in their full context." Duty Free Ams., Inc. v. Estee Lauder Cos., Inc., 797 F.3d 1248, 1277 (11th Cir. 2015).

The first type of claim, one for "literal falsity," clearly captures falsehoods that are explicitly stated, i.e, any representation that is "false on its face." Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007). Importantly, however, literal falsity may also be "proved by implication." Sussman-Automatic Corp. v. Spa World Corp., 15 F. Supp. 3d 258, 270 (E.D.N.Y. 2014).

Pursuant to this "false by necessary implication doctrine," a claim for literal falsity also exists "when, considering the advertisement in its full context, the relevant audience would recognize the false implied claim as easily as if it had been stated explicitly." Pamlab, L.L.C. v. Macoven Pharms., L.L.C., 881 F. Supp. 2d 470, 476 (S.D.N.Y. 2012).

---

[6] Although "any person who believes that he or she is likely to be damaged by such [an] act" may bring suit, 15 U.S.C. § 1125(a)(1), the Second Circuit requires that the alleged misrepresentation be of an "inherent quality or characteristic of the product." S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001).

"Under this doctrine, the court 'must consider the advertisement in its entirety and not . . . engage in disputatious dissection.'" <u>Pamlab, L.L.C.</u>, 881 F. Supp. 2d at 476 (quoting <u>Time Warner Cable, Inc.</u>, 497 F.3d at 158). "However, only an *unambiguous* message can be literally false. Therefore, if the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." <u>Id</u>.

"When an advertisement is proven to be literally false on its face, consumer deception is presumed, and the court may grant relief without reference to the advertisement's [actual] impact on the buying public." <u>Time Warner Cable, Inc.</u>, 497 F.3d at 153 (quoting <u>Coca-Cola Co. v. Tropicana Prods.</u>, 690 F.2d 312, 317 (2d Cir. 1982)). Consumer deception may also presumed "when the defendant intentionally set out to deceive the public, and the defendant's deliberate conduct in this regard [was] of an egregious nature." <u>C=Holdings B.V. v. Asiarim Corp.</u>, 992 F. Supp. 2d 223, 242 (S.D.N.Y. 2013) (citation and internal quotation marks omitted).

Alternatively, a party may pursue the second type of claim, known as an "implied claim," based on an theory that "the advertisement although literally true is nonetheless misleading." <u>Stokely-Van Camp, Inc. v. Coca-Cola Co.</u>, 646 F. Supp. 2d 510, 525 (S.D.N.Y. 2009). However, to succeed in a case where the statement at issue is not literally false, the claimant "must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers," and also "that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged

advertisement." Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 113 (2d Cir. 2010) (citations omitted).[7]

Accordingly, a party who seeks to prevail on a Lanham Act false advertising claim must ultimately show:  "(1) a false or misleading statement; (2) in connection with commercial advertising or promotion that (3) was material, (4) was made in interstate commerce, and (5) damaged or will likely damage the plaintiff." C=Holdings B.V., 992 F. Supp. 2d at 242.

## IV. DISCUSSION

As an initial matter, Chobani seeks to raise the threshold for preliminary injunctive relief even further, characterizing General Mills's request to halt the Commercial, Print Ad, and Digital Content as one that mandates, rather than prohibits, an action.

This distinction matters, since a party seeking a "mandatory" preliminary injunction must demonstrate a "clear" or "substantial" likelihood of success on the merits in addition to the other strictures imposed by the standard discussed above. See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995).  According to Chobani, this sort of victory would also remove the "fair grounds for litigation" aspect of the preliminary injunction standard from consideration. See Chobani Mem. Opp'n at 13.

"[T]he court's task when granting a preliminary injunction is generally to restore, and preserve, the status quo ante, i.e., the situation that existed between the parties immediately

_____

[7]  All that is required at the preliminary injunction stage on this second type of claim is a showing that a "not insubstantial number" of consumers received a false or misleading impression from the challenged advertisement. SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharms. Co., Inc., 906 F. Supp. 178, 181 (S.D.N.Y. 1995) ("A full-blown survey need not be undertaken . . .; rather evidence such as expert witnesses' testimony may be used to demonstrate the public's reaction to an ad.").

prior to the events that precipitated the dispute." <u>Asa v. Pictometry Intern. Corp.</u>, 757 F. Supp. 2d 238, 243 (W.D.N.Y. 2010).

In such cases, a preliminary injunction is understood to be "prohibitory"; that is, it "forbids or restrains an act" pending a trial on the merits of the dispute. <u>Louis Vuitton Malletier v. Dooney & Bourke, Inc.</u>, 454 F.3d 108, 114 (2d Cir. 2006) (quoting BLACK'S LAW DICTIONARY 788 (7th ed. 1999)).

However, preliminary relief may also "order[ ] an affirmative act or mandate[ ] a specific course of conduct, such as requiring a defendant to turn over phone numbers featuring a tradename or to assign a trademark[.]" <u>Louis Vuitton Malletier</u>, 454 F.3d at 114 (internal citation and quotations omitted).[8]  In those cases, the injunctive relief is understood to be "mandatory," and the heightened standard applies. <u>Id.</u>

Importantly, the "'[s]tatus quo' does not mean the situation existing at the moment the law suit is filed, but the 'last peaceable uncontested status existing between the parties before the dispute developed.'" <u>O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft</u>, 389 F.3d 973, 1013 (10th Cir. 2004) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice & Procedure</u> § 2948 (2d ed. 1995)).

In this case, the "last peaceable uncontested status" was the state of affairs existing *before* Chobani launched its Simply 100 Campaign around the New Year, since the claims made in that advertising are what give rise to the underlying dispute.  Indeed, district courts considering Lanham Act false advertising claims regularly apply the "prohibitory" standard when considering whether to issue a preliminary injunction. <u>See, e.g.</u>, <u>Schick Mfg., Inc. v.</u>

---

[8]  The heightened standard also applies where the preliminary injunction would "provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." <u>Tom Doherty Assocs., Inc.</u>, 60 F.3d at 33-34.

Gillette Co., 372 F. Supp. 2d 273, 276 n.1 (D. Conn. 2005) (rejecting non-movant's assertion that requested injunction was mandatory and concluding that movant "seeks to prohibit allegedly false advertising, not to mandate action" in context of Lanham Act false advertising claim).  Accordingly, the relief General Mills seeks here is "prohibitory" in nature.[9]

### 1.  Likelihood of Success on the Merits

General Mills contends it is likely to succeed on its claim that Chobani's Simply 100 Campaign is "literally false by necessary implication," because the statement "that stuff is used to kill bugs" conveys the literally false message that the potassium sorbate used in Yoplait Greek 100 renders it unsafe to eat.

Chobani defends its bug-killer claims by arguing that, not only is it literally true that potassium sorbate is used to kill bugs, but that the other challenged messages—that its products are "good" or that General Mills's artificial ingredients are "bad stuff"—are merely "puffery," statements of Chobani's own opinion about the superiority of its own natural products.

This argument is unpersuasive.  "Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language."  Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 945 (3d Cir. 1993); see also Lipton v. Nature Co., 71 F.3d 464, 474 (2d Cir. 1995) ("Subjective claims about products, which cannot be proven either true or false, are not actionable under the Lanham Act."  (citation omitted)).  "A puffing statement is not actionable because the audience for the statement cannot be deceived by it; it is quintessential 'sales

---

[9]  In any event, the result would be the same under the heightened standard, as will be made plain below.

talk . . . to be discounted as such by the buyer.'" Sussman-Automatic Corp., 15 F. Supp. 3d at 270 (citation omitted).

"[B]ut an advertiser treads a far different line when it not only lauds its own products, but directly attacks a competitor." Garden Way, Inc. v. Home Depot, Inc., 94 F. Supp. 2d 276, 278 (N.D.N.Y. 2000) (Kahn, J.). While the phrase "no bad stuff," if untethered to any comparison claim specifically referencing General Mills's product, may be considered the sort of commendatory overstatement incapable of deceiving a consumer, the Simply 100 Campaign[10] employs that negative phrasing in connection with other statements and images that paint General Mills's products as a safety risk because they contain potassium sorbate. Cf. Church & Dwight Co., Inc. v. Clorox Co., 840 F. Supp. 2d 717, 721 (S.D.N.Y. 2012) (noting certain assertions "may necessarily imply more sweeping claims about that product").

Putting aside the fact that Chobani's statements about potassium sorbate may be literally true, courts regularly recognize that even where "no combination of words" found in the advertisement is untrue, the message conveyed by the advertisement may still be "literally false" if its clear meaning, considered in context, is false. Time Warner Cable, Inc., 497 F.3d at 154-55; see also RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 3 cmt. d. (1995) ("Some representations of opinion may imply the existence of facts that justify the opinion, or at least that there are no facts known to the speaker that are substantially incompatible with the stated opinion.").

---

[10] Although portions of the Digital Content do not make these kind of claims in the context of product comparisons, it also includes a link to a fully reproduced version of the Print Ad. Therefore, these two aspects of the campaign are considered in tandem.

For example, in <u>Polar Corp. v. Coca-Cola Co.</u>, the Court preliminarily enjoined Polar, a seltzer company, from broadcasting a thirty-second commercial featuring

> [A] computer-generated polar bear that examines a Coke can, makes an unhappy sound and flips the can over his shoulder into a trash bin. A sign over the bin reads 'Keep the Arctic Pure.' The polar bear then reaches down into the freezing, Arctic water and pulls out a can of Polar Seltzer. He (or she) then drinks the Polar soda and smiles contentedly.

871 F. Supp. 1520, 1521 (D. Mass. 1994). The Court found that this commercial "implied that Coke is not pure" and, given that there was "no evidence suggesting" that to be to true, this was a "misrepresentation of the nature and quality of Coke." <u>Id</u>. The Court further found that Coca-Cola was "engaged in an industry that relie[d] heavily on the consumer's perception of quality and purity," and thus irreparable harm would likely accrue as a result of this falsehood. <u>Id</u>.

With these principles in mind, it is easy to conclude that General Mills has demonstrated a substantial likelihood of success on the merits of its false advertising claim, since it is likely that a factfinder would conclude that the challenged aspects of the Simply 100 Campaign unambiguously convey the literally false message that Yoplait Greek 100, which contains the same "stuff [that] is used to kill bugs," is unsafe to consume.[11] <u>N. Am. Olive Oil Ass'n v. Kangadis Food Inc.</u>, 962 F. Supp. 2d 514, 520 (S.D.N.Y. 2013) ("The question here . . . is not whether a reasonable trier of fact *could* find [advertiser's claim] literally false, but whether it is *likely* to do so.").

---

[11] Product safety is clearly an "inherent quality or characteristic" sufficient to meet the materiality requirement.

Although Chobani suggested at oral argument that the question of potassium sorbate's safety is still the subject of legitimate scientific debate, there is little support in the record for that proposition.[12]  To the contrary, the balance of record evidence reflects that potassium sorbate is a well-studied compound repeatedly determined to be safe for a variety of uses.  Cf. Time Warner Cable, Inc. v. DIRECTV, Inc., 475 F. Supp. 2d 299, 306 (S.D.N.Y. 2007) ("The commercial's assertion that a viewer cannot 'get the best picture without DIRECTV' is therefore likely to be proven *literally false*, in that the undisputed factual record here establishes that [both parties] provide [ ] pictures of equal quality."  (emphasis added)), vacated in part on other grounds by 497 F.3d at 163.

To be sure, the Simply 100 Campaign is factually distinguishable in certain respects from Polar Corp. and the other cases cited by General Mills.  But the aggregate similarities far outweigh the reasonable distinctions.  Indeed, accepting Chobani's arguments would amount to the sort of "disputatious dissection" forbidden in this analysis.  Accordingly, General Mills is likely to prevail on the merits of its Lanham Act false advertising claim.

**2.  Likelihood of Irreparable Harm**

General Mills contends it has suffered, and will continue to suffer, substantial injury from Chobani's Simply 100 advertising campaign, including but not limited to loss of sales, market share, and goodwill.  General Mills also claims that a presumption of irreparable harm exists where, as here, a party has established a likelihood of success on a claim that its product was specifically identified in a false, comparative advertisement.  Chobani argues that the presumption of harm on which General Mills relies has since been abrogated, and

---

[12]  Chobani's opposition paperwork includes some damning language in this regard, since  "Chobani expressly acknowledges that potassium sorbate has been deemed safe for food use."  Chobani Opp'n at 22.

that General Mills has failed to adduce any non-speculative evidence to support the requisite showing of irreparable injury.

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." Reckitt Benckiser Inc., 760 F. Supp. 2d at 452 (quoting Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227, 233-34 (2d Cir. 1999)).  Historically, a plaintiff who successfully demonstrated a likelihood of success in showing the literal falsity of a "defendant's comparative advertisement mentioning the plaintiff[']s product by name" was entitled to a presumption of irreparable harm. Id. at 453.  "This is because a false 'comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer.'" Time Warner Cable, Inc., 497 F.3d at 162 (quoting McNeilab, Inc. v. Am. Home Prods. Corp., 848 F.2d 34, 38 (2d Cir. 1988)).

Here, the parties are obviously direct competitors with respect to the products at issue.  And as discussed above, the allegedly false message was made in the context of an advertising campaign explicitly referencing General Mills's product.  This fact, combined with the fact that General Mills has satisfied its burden of showing a substantial likelihood of success on its literal-falsity-by-necessary-implication claim, would ordinarily result in a presumption of irreparable harm.

However, as Chobani suggests, "it may be that this presumption of irreparable harm is no longer permissible and that the longstanding precedent referenced above has given way to a new standard." Reckitt Benckiser Inc., 760 F. Supp. 2d at 453.  For example, in a Lanham Act copyright case, the Second Circuit has cautioned that a "court must not adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm (unless such a 'departure from the long tradition of equity practice' was intended by

Congress)." Salinger, 607 F.3d at 80 (quoting eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 393-94 (2006)).

In fact, other Circuits have gone so far as to expressly eliminate the presumption. See, e.g., Ferring Pharms., Inc. v. Watson Pharms., Inc., 765 F.3d 205, 216 (3d Cir. 2014) ("Because a presumption of irreparable harm deviates from the traditional principles of equity, which require a movant to demonstrate irreparable harm, we hold that there is no presumption of irreparable harm afforded to parties seeking injunctive relief in Lanham Act cases."); Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc., 736 F.3d 1239, 1249 (9th Cir. 2013) ("[T]he landscape for benchmarking irreparable harm has changed with the Supreme Court's decisions in [eBay Inc.] in 2006 and Winter in 2008.").

But even assuming the presumption of irreparable harm is no longer available, General Mills has still carried its burden on this element. "It is virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement." Coca-Cola Co. v. Tropicana Prods., Inc., 690 F.2d 312, 316 (2d Cir. 1982). Therefore, "[t]o demonstrate irreparable harm in a Lanham Act case, a party must show two things: (i) that the parties are competitors in the relevant market; and (ii) that there is a logical causal connection between the alleged false advertising and its own sales position." CJ Prods. LLC, 809 F. Supp. 2d at 149 (citation and internal quotation marks omitted).

As noted above, there is no question that the parties here are in direct competition in the relevant market, no matter how that term is defined. In fact, not only do they compete generally in the health food and yogurt markets, but also specifically in the market for low-calorie Greek yogurt products. And it is likewise easy to conclude that a logical causal

connection exists between the alleged false advertising at issue and General Mills's own sales position, since "the sales of one party's products would certainly impact the sale of the other party's product." CJ Prods. LLC, 809 F. Supp. 2d at 149.

Indeed, "no detailed study of consumer reactions is necessary to conclude inferentially that [the advertiser] is likely to divert customers from [the competitor's] product to its own unless the offending commercial is enjoined." Church & Dwight Co., Inc., 840 F. Supp. 2d at 727; see also N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010) (noting that "[p]rospective loss of [ ]good will alone is sufficient to support a finding of irreparable harm"). Accordingly, General Mills has satisfied its burden of demonstrating irreparable harm.

### 3. **Balance of Hardships**

As discussed above, General Mills has demonstrated irreparable harm if the literally false statements made in the Simply 100 advertising campaign continue to be disseminated. As for Chobani, it cannot assert an equitable interest in perpetuating false claims generally, let alone ones that specifically single out a competitor's product. See, e.g., CJ Prods. LLC, 809 F. Supp. 2d at 149 ("Defendants are unable to assert an equitable interest in continuing a false advertising campaign."); Reckitt Benckiser Inc., 760 F. Supp. 2d at 456-57 (noting a party cannot "assert an equitable interest in the perpetuation of an advertising campaign that is literally false"). Therefore, the balance of hardships favors General Mills.

### 4. **Public Interest**

"'In exercising their sound discretion, courts of equity should pay particular regard [to] the public consequences in employing the extraordinary remedy of injunction.'" Winter, 555 U.S. at 24 (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)).

It is self-evident that preventing false or misleading advertising is in the public interest. See N. Am. Olive Oil Ass'n, 962 F. Supp. 2d at 524 (noting public interest would be "well served by ensuring that consumers do not purchase a product based on false advertising"); Osmose, Inc. v. Viance, LLC, 612 F.3d 1298, 1321 (11th Cir. 2010) ("[T]he public interest is served by preventing customer confusion or deception.").

If anything, this interest is heightened when the information pertains to issues of food safety. Cf. CJ Prods. LLC, 809 F. Supp. 2d at 149 ("The public has a strong interest in receiving accurate information, especially when it comes to products marketed specifically for children."). Therefore, the issuance of an injunction would be in the public interest.

### 5. **Summary**

General Mills has demonstrated, by a clear showing, that the necessary elements are satisfied. Therefore, the only question remaining is whether, and for what value, General Mills must post a bond. See FED. R. CIV. P. 65(C) ("The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.").

The parties agreed at oral argument that a bond in the amount of $1,000,000 would be appropriate. After careful consideration of the factors set forth above, and mindful of the "broad discretion" afforded a district court "in the matter of setting the sum for security," departure from this agreed-upon value would be unwarranted. See CJ Prods. LLC, 809 F. Supp. 2d at 163. Accordingly, General Mills will be required to post a bond in the sum of $1,000,000.

**IV. CONCLUSION**

Chobani is free to continue to spread its message about the value of selecting natural ingredients. It is not, however, free to disseminate the false message that potassium sorbate renders Yoplait Greek 100 unsafe to consume.

Therefore, it is

ORDERED that

1. General Mills's motion for a preliminary injunction is GRANTED;

2. Chobani, its agents, its servants, its employees, and its officers, and all other persons in active concert or participation with it who receive actual notice of this Preliminary Injunction, by personal service or otherwise, are hereby enjoined and restrained, pending the final determination of this action, from disseminating or causing to be disseminated anywhere in the United States, via television, radio, printed publications, and all Internet transmissions, including, but not limited to:

a. The Commercial;

b. The Print Ad;

c. The Digital Content;

d. The following claims in its marketing and advertising as they relate to General Mills products:

i. General Mills products, including Yoplait Greek 100, are unsafe because they contain potassium sorbate;

ii. General Mills products, including Yoplait Greek 100, contain "stuff [ ] used to kill bugs";

iii. Potassium sorbate is unsafe for consumers;

iv.  General Mills products, including Yoplait Greek 100, are unsafe or harmful; and

v.  Use of the term "no bad stuff" as it relates to General Mills products, including Yoplait Greek 100;

3.  General Mills shall post an undertaking within five (5) business days of the entry of this Order with the Clerk of the Court in the sum of $1,000,000 as security for the payment of such costs and damages as may be incurred or suffered by Chobani; and

4.  The preliminary injunction shall go into effect immediately upon acceptance of the required security by the Clerk of the Court.

IT IS SO ORDERED.

United States District Judge

Dated:  January 29, 2016
        Utica, New York.